**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| **KADI CHANNELL**, Individually and as Parent and Next Friend of J.C., a minor, | |
| Plaintiff, | |
| v. | **Case No**. |
| **CHICAGO BOARD OF EDUCATION a/k/a CHICAGO PUBLIC SCHOOLS;** | |
| Defendant. | |

**COMPLAINT**

**INTRODUCTORY STATEMENT**

1.     This case is about a student with multiple disabilities who all parties agree needs nursing services and who is not receiving them because of the method the Chicago Board of Education (CPS) chose to administer these services. Without these nursing services, the student cannot attend school and cannot meaningfully benefit from the program CPS has offered.

2.     The student and the student's parent seek declaratory and injunctive relief ordering CPS to adjust its administrative system so that the student can resume his education and receive the nursing services the Defendant agreed to provide as part of the student's educational program.

**JURISDICTION**

3.     This Court has jurisdiction over J.C.'s claims pursuant to 28 U.S.C. §

1331 (conferring jurisdiction over civil actions arising under laws of the United

States) and 28 U.S.C. § 1343(a)(3) (conferring jurisdiction over civil actions to

redress the deprivation, under color of any state law of any right secured by any Act

of Congress providing for equal rights of citizens) since they arise under the

Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, the Rehabilitation

Act, 29 U.S.C. § 794, and the Individuals with Disabilities Education Act (IDEA), 20

U.S.C. § 1400, *et seq.*

4.     This Court is the appropriate venue under 28 U.S.C. § 1391(b), in that

the Defendants are subject to personal jurisdiction in this District and the events

giving rise to this Complaint occurred in this District.

**PARTIES**

5.     J.C.[1] is a sixteen-year-old student with disabilities. J.C. resides in

Chicago, in the Northern District of Illinois.

6.     Ms. Channell is J.C.'s mother, sole legal guardian, and his parent

within the meaning of the IDEA. *See* 34 C.F.R. § 300.30. J.C.'s father is deceased.

7.     Defendant Chicago Board of Education, also known as Chicago Public

Schools ("CPS"), is constituted within Illinois for administrative control and

direction of public elementary schools in the City of Chicago, which is located in the

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2, J.C.'s initials are provided in lieu of his full name, as he is a minor. *See* Fed. R. Civ. Pro. 5.2(a)(3).

Northern District of Illinois. CPS is a "local educational agency" within the meaning of IDEA and the Rehabilitation Act. CPS is also a "public entity" as defined by Title II of the ADA. 42 U.S.C. § 12131(1).

8.     The Defendant receives federal funds from the United States Department of Education pursuant to IDEA for the purpose of educating students with disabilities, and is responsible, *inter alia*, for ensuring that J.C. receives a free appropriate public education ("FAPE") under the law. *See* 20 USC §§ 1401(9)(d); 1412(a)(1)(j). Due to the District's status as a public entity and its receipt of public funds, the Defendants are prohibited from discriminating against J.C. for his disabilities. *See* 42 U.S.C. § 12131 and 29 USC § 794(a) respectively.

## THE LAWS INVOLVED

### THE AMERICANS WITH DISABILITIES ACT (ADA)

9.     The ADA contains four substantive titles that address discrimination in the areas of employment, public services, public accommodations, and telecommunications. 42 U.S.C. § 12101 *et seq*. Kadi Channell and J.C. bring this complaint under Title II of the ADA, which governs public services and protects individuals from discrimination on the basis of disability by public entities.

10.     A public entity is defined to include "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

11.     The law governing Title II is found at 42 U.S.C. § 12131 *et seq*. and the implementing regulations are codified at 28 C.F.R. § 35.101 *et seq*.

12. Pursuant to the ADA, CPS cannot deny a person with disabilities "the benefits of [its] services, programs, or activities." 42 U.S.C. § 12132.

13. CPS also cannot discriminate against Kadi Channell because of her association with a person with a disability. 28 C.F.R. § 130(g).

14. The ADA requires CPS to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

15. The ADA also prohibits CPS from denying benefits "through contractual, licensing, or other arrangements." 28 C.F.R. § 35.130(b)(1).

16. The ADA also prohibits CPS from utilizing "methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3)(i).

## THE REHABILITATION ACT

17. Section 504 of the Rehabilitation Act prohibits discrimination by recipients of federal funding against otherwise qualified individuals on the basis of their disabilities. 29 U.S.C. § 794.

18. The Rehabilitation Act and the ADA are functionally identical except that the Rehabilitation Act also requires proof of the receipt of federal funds. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

## INDIVIDUALS WITH DISABILITIES EDUCATION ACT

19.     The Individuals with Disabilities Education Act (IDEA),20 U.S.C. § 1400 *et seq.*, requires state and local school districts that receive funds under IDEA to provide school-age residents with disabilities a "free appropriate public education" (FAPE). 20 U.S.C. § 1412(a)(1).

20.     FAPE is defined, in part, as education provided in conformity with a child's Individual Education Plan (IEP). 20 U.S.C. § 1401(9)(d).

21.     Under IDEA, every student receiving special education services must be given an IEP annually. 20 U.S.C. §§ 1401(14), 1412(a)(4), 1414(a), and 1414(d).

22.     The IEP must set forth all special education and related services the school district will provide as well as the student's educational goals. 34 C.F.R. § 300.320(a)(4).

## STATEMENT OF THE CASE

23.     J.C. was born on July 19, 2005. He has attended six CPS schools since preschool.

24.     J.C. began having seizures at age five. In 2010, he was diagnosed with Seizure Disorder and Attention Deficit Hyperactivity Disorder ("ADHD").

25.     In 2011, CPS gave J.C. an IEP as a student with Other Health Impairment. J.C.'s seizures caused him to miss a great deal of school.

26.     J.C. started seeing a psychiatrist when he was six years old. The psychiatrist recommended that J.C. see a therapist to manage J.C.'s ADHD and

develop coping strategies to calm himself down after experiencing a seizure.

27.    In fourth grade, J.C. started to be bullied and disciplined in school because of his ADHD connected behaviors. When this happened, the parent increased his counseling sessions from once a month to once a week.

28.    The more seizures J.C. had, the more social-emotional difficulties he had. Eventually, by 2018, J.C.'s doctor diagnosed him as a person with Oppositional Defiant Disorder ("ODD") and Adjustment Disorder with Depression.

29.    In eighth grade, J.C.'s IEP Team revised his IEP to require dedicated nursing support for J.C. throughout the school day and on the bus. CPS adopted J.C.'s doctor's recommendation to provide a dedicated nurse because a medication called Diastat had to be administered rectally if J.C. experienced a seizure lasting more than five minutes. A person must be licensed to administer Diastat because it is a controlled substance and because of the way in which it must be administered. Given the potential for a life-threatening error, the IEP Team agreed that an aide would not be allowed to administer this type of medication.

30.    J.C. attended eighth grade at a campus of Chicago International Charter School (CICS), a CPS-authorized charter school, and CPS provided a nurse for the school bus and throughout the school day.

31.    That year, J.C. missed at least twenty days of school because the nurse was absent and the District did not provide a replacement. The District failed to even provide homebound services on days J.C. missed due to the nurse's absences.

32. In the fall of 2019, J.C. started high school at Chicago Collegiate, a different CPS-authorized charter school. In the fall of 2020, he returned for his sophomore year in the fall of 2020. Again, CPS provided a nurse for the school bus and throughout the school day as required by J.C.'s IEP.

33. Initially, J.C. and his parent were pleased with his new school. J.C. and Ms. Channell particularly loved his new nurse, Metia Sanders. Ms. Sanders would drive to the family's house in the morning and leave her car there as she rode the bus with J.C. to school. At first, Ms. Sanders attended classes with J.C. but eventually, she worked in an office and would go get J.C. when it was time to administer his medication or to check in on him. Ms. Sanders would then ride the bus home with J.C. Ms. Sanders rarely missed work, so J.C.'s absences were greatly reduced as compared to his less consistent nursing in eighth grade.

34. About two months after J.C.'s start at Chicago Collegiate, J.C.'s academic skills were evaluated by the District. J.C.'s basic reading skills were in the sixth percentile; his spelling skills in the third percentile; and his writing skills in the second percentile. The school was very candid about the fact that it did not have an established literacy program for a student like J.C. who had dyslexia-like deficits in decoding, spelling, and writing difficulties. The CPS District Representative, Carmille Talley, said that while CPS offers programs for students with dyslexia in some CPS schools, the District would not make it available to J.C. because he attended a charter school. As a result, J.C. did not have the literacy

7

skills to access the curriculum and much of the instruction was misaligned to his functioning.

35.     In addition to the poorly aligned instruction and lack of appropriate programming, Chicago Collegiate had difficulty retaining sufficient special education teachers and aides. The school did not have a special education math teacher for all of J.C.'s freshman year or the spring semester of his sophomore year, despite J.C.'s IEP requiring that his math instruction be provided by such a teacher. There was a lot of staff turnover. Because J.C. is a person with Oppositional Defiant Disorder, the high level of staff turnover frequently resulted in him not having sufficient time to build an appropriate educational relationship with instructors and aides which further slowed his learning.

36.     Midway through the 2019-2020 school year, J.C. started to be bullied again. The parent would report her concerns to the school with little response. The bullying exacerbated J.C.'s depression. In May 2020, his doctor put him on an antidepressant. J.C. returned to weekly therapy sessions, which had been previously reduced to monthly sessions.

37.     On December 11, 2020, at the midpoint of J.C.'s sophomore year, J.C.'s IEP Team met. Ms. Channell attended this meeting with Jacqueline Ross, her attorney from the ChildLaw Clinic at Loyola University Chicago School of Law ("Loyola ChildLaw Clinic"). During this meeting, the team agreed that J.C. required IEP goals that focused on his learning phonics to improve his decoding and spelling. The team discussed J.C.'s need for a research-based, multisensory literacy program,

such as the Wilson Reading System, to improve his literacy skills. The team agreed that J.C.'s needs were too complex for his current school and that he required a therapeutic day school that offered such a literacy program.

38.     During the December 11, 2020, IEP meeting, Ms. Channell proposed Acacia Academy as an appropriate therapeutic day school for J.C., because it offered a reputable, research-based, multisensory reading program to address J.C.'s significantly impaired literacy skills. Acacia would also satisfy J.C.'s need for a calmer, more predictable, therapeutic environment that would prevent bullying from occurring.

39.     Acacia Academy is a private school for students with disabilities located in LaGrange, Illinois. The school originally opened as a clinic for students with dyslexia and continues to offer the Wilson Reading System, a multisensory literacy curriculum proven effective in teaching students with dyslexia to read.

40.     The December 11, 2020, IEP meeting had to be reconvened as the team ran out of time to discuss all of J.C.'s needs. After the meeting, CPS District Rep, Carmille Talley, emailed Ms. Channell confirming that the District was in agreement that J.C. needed a multisensory literacy program.

41.     On December 11, 2020, the ChildLaw Clinic sent Acacia Academy's founder and director, Kathie Fouks, J.C.'s IEP and psychological evaluation to consider him as a potential student. On December 14, 2020, Ms. Fouks and Ms. Channell met over Zoom to discuss J.C.'s educational needs and Acacia's program. Ms. Fouks explained that Acacia did not have a nurse on staff and it was unlikely

anyone on her staff would be willing to travel on the bus to/from school with J.C. since the family lived in Chicago and her staff live in the suburbs. Still, Ms. Fouks said that as long as CPS could provide for J.C.'s safety by hiring a nurse, J.C. would be a welcomed addition to Acacia Academy and that his learning profile was a great fit for the program.

42.     On December 16, 2020, the IEP Team reconvened to consider J.C.'s nursing needs. Ms. Talley insisted that J.C. only required a seizure delegated care aide to safely attend school, instead of a nurse. According to Ms. Talley, this was a new position in CPS. The aide would be a non-nurse staff member who would complete an annual specialized training to assist J.C. This aide would travel on the bus with J.C. to and from school as well as remain with him throughout the school day to monitor J.C.'s seizure activity and administer medication in the event of a seizure.

43.     Ms. Channell did not agree with this proposed revision. On December 16, 2020, despite Ms. Channell's disagreement, the IEP Team finalized J.C.'s IEP which directed his placement at a therapeutic day school that offered a phonics-focused literacy program, such as the Wilson Reading System, and provided the services of a seizure delegated care aide instead of a nurse.

44.     Although the IDEA requires school districts to implement a revised IEP within ten school days of its revision, CPS did not place J.C. in an appropriate placement in that time frame.

45.     On January 6, 2021, Ms. Talley reached out to Acacia Academy's

Director, Kathie Fouks. She explained that Acacia was the District's first choice for J.C. She asked if Ms. Fouks had a staff member who would be willing to be trained as a delegated seizure aide. Ms. Fouks later responded that Acacia could not provide a staff member to satisfy the need for an aide on J.C.'s bus ride because no Acacia staff lived near enough to J.C. to make it possible to add that additional trip to their work day.

46.     On January 6, 2021, Ms. Channell received a report describing J.C.'s literacy skills from an organization called Redwood Literacy. Ms. Channell sought an independent evaluation to see if J.C. had regressed during his time at Chicago Collegiate. The report's findings were deeply troubling. J.C. was below the first percentile in each area tested. As a sophomore in high school, he was reading at the beginning of sixth grade level. The evaluator explained that it was a concerning oversight that J.C. had gone so long without receiving an intensive, research-based, multisensory literacy program, such as the Wilson Reading System. Redwood recommended that J.C. start receiving this instruction, delivered by a certified provider, immediately.

47.     On January 12, 2021, Ms. Channell received a letter from CPS' Placement Office stating that CPS had placed J.C. at Menta Academy in Oak Park.

48.     On or around January 18, 2021, Ms. Channell called Menta Academy and spoke with Menta's principal, Anna Fink. Ms. Channell learned that Menta was a program for "at-risk youth" and that it does not have a research-based reading program for students with dyslexia. She worried that this sort of negative

11

peer group would be extremely distracting and anxiety-inducing for J.C., given his diagnoses of ADHD and Adjustment Disorder.

49.    On January 22, 2021, prompted by her concerns regarding Menta Academy and the results of J.C.'s Redwood evaluation, Ms. Channell requested state-sponsored mediation with CPS. On February 9, 2021, the District responded that it was willing to participate in mediation.

50.    On February 25, 2021, the parties met in mediation but did not reach an agreement. However, later that same day, Ms. Talley followed up with Ms. Fouks, Acacia's Director. Ms. Talley informed Ms. Fouks that, because J.C. would continue with remote learning for the spring 2021 semester due to COVID, there was not an immediate need to have a nurse on the bus for J.C. Ms. Talley explained that remote learning would give CPS time to resolve the bus issue for the fall.

51.    That same day, on February 25, Acacia Academy told CPS that it agreed to immediately admit J.C. to their school without a nurse because they were operating remotely. However, Ms. Fouks stated that this acceptance was conditional on CPS agreeing to provide a nurse for the start of the Fall 2021-22 semester when the school expected to return to in-person learning.

52.    One week later, on March 4, 2021, J.C. started at Acacia. J.C. responded well to this placement. After his first day of remote learning with Acacia, J.C. did a "happy dance." He told Ms. Channell that he felt this school was different. It was warm, and he felt accepted and welcomed.

53.     On June 11, 2021, J.C.'s IEP Team held an IEP meeting for J.C. Staff from CPS and Acacia, in addition to Ms. Channell and her attorney, participated. This time, a nurse from CPS, Ms. Laura Herbert, participated. Ms. Channell repeated her concern that a seizure aide was inappropriate given the possible need for a rectally-administered medication. Ms. Herbert agreed, and the team revised J.C.'s IEP to reflect his need for a nurse to travel to and from school with him and to remain in the building throughout the school day. *See* IEP dated June 11, 2021, attached as Exhibit A.

54.     During this meeting, CPS District Representative, Christine Vega-Castro explained the process CPS would use to advertise the nursing position. Ms. Channell offered to provide the contact information for J.C.'s former nurse from Chicago Collegiate so the District could consider hiring her for the position.

55.     After the meeting, the parties exchanged emails to follow-up on these discussions and provide updated documentation from J.C.'s doctor corroborating his need for a nurse. Ms. Channell also provided the contact information for J.C.'s former nurse. The District responded that it would forward the documents but could not guarantee hiring that specific nurse.

56.     On July 19, 2021, in preparation for the new school year, Ms. Channell's attorney emailed Ms. Vega-Castro to ask whether CPS had successfully hired a nurse or if it had, at least, posted the position. Ms. Vega-Castro wrote back that she would look into it and respond to Ms. Channell's attorney.

57.    Neither Ms. Vega Castro nor any other CPS employee followed up with Ms. Channell's attorney. Instead, Ms. Fouks informed Ms. Channell's attorney on July 26, that a CPS employee reached out to Ms. Fouks and told her that Acacia would now need to hire a nurse for J.C.

58.    Staff at Acacia contacted a nursing agency called Stepping Stones to explore the possibility of fronting the nursing expense pending CPS reimbursement. The agency explained that they charge $65 an hour for a registered nurse ("RN") and $55 an hour for a licensed practical nurse ("LPN").  Given that J.C. would require at least eight hours of nursing services a day, Acacia estimated this would be a weekly cost of $2,600 or $2200.

59.    Acacia has experience with CPS's reimbursement system because it is reimbursed for the cost of hiring paraprofessionals for students CPS places at Acacia.

60.    These paraprofessional costs are less than the cost of a nurse. During the 2020-2021 school year, if a student required a paraprofessional, Acacia charges districts an "intensive rate" of $285.16 a day or $1425.80 a week.

61.    From this experience, Acacia staff had learned that the CPS reimbursement timeline is unpredictable and that CPS sometimes refuses reimbursement of expenses previously promised.

62.    Because Acacia could not afford to absorb the up-front nursing cost for months at a time and because it could not risk denial of reimbursement, Acacia

informed Ms. Channell's attorney that it required CPS to administer the nursing service in another manner.

63.     On August 9, 2021, Ms. Channell's attorney emailed Marlene Fuentes, CPS' Senior Assistant General Counsel, explaining that Acacia was not able to provide J.C. services under CPS's reimbursement proposal. Ms. Channell's attorney proposed that CPS appoint one of the nursing agencies with which CPS already contracts. Ms. Channell's attorney argued that using a nurse from an already approved agency/vendor would give J.C. the best chance of having a nurse in place for Acacia's first day of school on August 26, 2021.

64.     On August 11, 2021, Marlene Fuentes, CPS' Senior Assistant General Counsel, responded to Ms. Channell's attorney. Ms. Fuentes wrote that she connected Ms. Fouks with Dr. Kimberly Moore, the CPS Director of Procedures and Standards. Ms. Fuentes did not confirm CPS would hire or pay a nurse nor did she explain the purpose of connecting Acacia with Dr. Moore.

65.     After further email exchange about the purpose of connecting Ms. Fouks with Dr. Moore, Ms. Fuentes explained that if Acacia could not provide nursing services, CPS would start looking to place J.C. at a different school.

66.     Ms. Fouks immediately followed up with Dr. Moore about the nursing request. As of the filing of this complaint, she has not received a response from Dr. Moore.

67.     On August 23, 2021, Ms. Channell received a call from the school bus company to share J.C.'s pick up/drop off details. The bus company shared that they had received no information regarding a school nurse traveling on the bus with J.C.

68.     On August 26, 2021, Acacia had its first day of school.

69.     J.C. did not attend class the first day, as it is unsafe for him to attend class without nursing services.

70.     J.C. cannot attend class remotely because all instruction at Acacia is currently in-person.

71.     As of the filing of this complaint, no CPS employee has offered a reason why CPS cannot provide a nurse from one of its existing contractors to satisfy J.C.'s IEP or why it reneged on the previous arrangement of CPS hiring the nurse rather than Acacia.

72.     The bulk of J.C.'s IEP is focused on his need for a multisensory literacy program. CPS has not identified another school that can implement such a program or facilitate J.C.'s progress on his IEP goals. Ex. A.

73.     Another focus of J.C.'s IEP is to implement coping strategies and respond positively to directions the first time. Educating J.C. in a chaotic setting designed for at-risk youth will go against this goal. Ex. A.

74.     On information and belief, CPS uses methods of administering nursing services at therapeutic days schools besides reimbursement including using contract agencies to staff charter schools and therapeutic day schools.

75.     On information and belief, it would not fundamentally alter the nature of CPS's educational program for CPS to administer nursing services at Acacia in a manner other than by reimbursement.

76.     As of the filing of this complaint, CPS has not advised Acacia that it has contracted with or appointed a nurse to work with J.C.

77.     The Defendants' refusal to appoint a nurse to Acacia is preventing J.C. from having the normative, developmentally critical experience of going to school with his peers and teachers and from receiving the education to which he is entitled to under law.

78.     By email dated September 9, 2021, Ms. Fuentes indicated that CPS would remove J.C. from Acacia and refer him to "other therapeutic placements that can implement the IEP." S*ee* emails from August 27, 2021 to September 10, 2021, attached as Exhibit B.

79.     The following day, Ms. Fuentes identified the problem with providing nursing at Acacia revolved around "the appropriate process for funding nursing support." Ex. B.

**COUNT I: DISCRIMINATION UNDER § 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. § 794 *et seq.*)**

80.     Paragraphs 1 – 79 above are incorporated as if set forth fully herein.

81.     Section 504 of the Rehabilitation Act prohibits discrimination against otherwise qualified individuals on the basis of their disabilities by recipients of federal funding. *See* 29 U.S.C. § 794.

82.     Under § 504, entities receiving federal financial assistance must make reasonable accommodations in their rules, policies, and practices when necessary to avoid discriminating against a person on the basis of a disability.

83.     Defendant receives federal funding and is subject to the requirements of § 504.

84.     J.C. is "handicapped" within the meaning of § 504.

85.     J.C. is entitled and qualified to participate in the unique educational program provided by his IEP.

86.     Kadi Channell, J.C.'s mother, is an aggrieved person within the meaning of § 504.

87.     Based on the nature of his disabilities, J.C. requires the specialized program that Acacia offers. CPS agreed J.C. required it which is why it placed J.C. there. Yet, Defendant is discriminating against J.C. and Kadi Channell because the method Defendant is choosing to administer its nursing program denies J.C. the benefit of the services of Acacia Academy, the therapeutic day school at which CPS enrolled J.C. in compliance with his IEP. This denies J.C. and Ms. Channell an equal benefit from CPS' school program.

88.     Defendant is discriminating against J.C. and Kadi Channell by refusing to modify its administrative system to accommodate J.C.'s needs and provide nursing services at the therapeutic day school identified in J.C.'s IEP.

89.     Section 504 also prohibits Defendant from segregating individuals with disabilities and requires Defendant to ensure that people with disabilities receive services in the most integrated setting. CPS is segregating J.C. and other individuals who require nursing from therapeutic day schools that are education options for CPS students whose disabilities do not require provision of nursing services. As a result of this segregation, J.C. is being minimally educated in his home rather than the most integrated setting appropriate for him, a therapeutic day school.

90.     Defendant's acts and omissions constitute a violation of J.C. and Kadi Channell's rights under § 504. Defendant's conduct constitutes an ongoing and continuous violation of § 504, and unless restrained and enjoined from doing so, Defendants will continue to violate § 504. The Defendants' acts and omissions, unless enjoined, eliminate J.C.'s access to the educational program he requires by nature of his disabilities and will continue to inflict irreparable injuries for which Plaintiffs have no adequate remedy at law.

**COUNT II: THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12131)**

91.     Paragraphs 1 – 79 above are incorporated as if set forth fully herein.

92.     Title II of the ADA prohibits discrimination against individuals with disabilities and extends the non-discrimination rule of § 504 of the Rehabilitation Act to services provided by any public entity. See 42 U.S.C. § 12132.

93.     Pursuant to the ADA, CPS cannot deny a person with disabilities "the benefits of [its] services, programs, or activities." 42 U.S.C. § 12132.

94.     CPS also cannot discriminate against Kadi Channell because of her association with a person with a disability.

95.     The ADA requires CPS to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

96.     The ADA also prohibits CPS from denying benefits "through contractual, licensing, or other arrangements." 28 C.F.R. § 35.130(b)(1).

97.     The ADA also prohibits CPS from denying benefits by methods of administration. 28 C.F.R. § 35.130(b)(3).

98.     Under the ADA, public entities must provide reasonable modifications when a policy, practice or procedure discriminates on the basis of disability. Public entities must also make reasonable accommodations in their rules, policies and practices when necessary to avoid discriminating against a person on the basis of a disability.

99.     Defendants are public entities subject to the requirements of the ADA.

100.    J.C. is a qualified individual with a disability within the meaning of the ADA.

101.    Kadi Channell is an aggrieved person within the meaning of the ADA.

102.    Defendant is discriminating against J.C. and Kadi Channell by administering a school nursing program in such a manner that J.C. cannot receive the services in his IEP at the school placement directed by his IEP.

103.    Defendant is discriminating against J.C. and Kadi Channell by refusing to modify the administrative process for providing nursing services in such a manner that would allow J.C. to receiving those services at the school placement directed by his IEP.

104.    Defendant's acts and omissions constitute a violation of J.C. and Kadi Channell's rights under the ADA. Defendant's conduct constitutes an ongoing and continuous violation of the ADA, and unless restrained and enjoined from doing so, Defendants will continue to violate the ADA. Defendants' acts and omissions, unless enjoined, will continue to inflict irreparable injuries for which Plaintiffs have no adequate remedy at law.

## COUNT III: INDIVIDUALS WITH DISABILITIES EDUCATION ACT (20 U.S.C. § 1400)

105.    Paragraphs 1-79 above are incorporated as if set forth fully herein.

106.    The Individuals with Disabilities Education Act (IDEA),20 U.S.C. § 1400 *et seq.*, requires state and local school districts that receive funds under IDEA to provide school-age residents with disabilities a "free appropriate public education." (FAPE) 20 U.S.C. § 1412(a)(1).

107. FAPE is defined, in part, as education provided in conformity with a child's Individual Education Plan. (IEP) 20 U.S.C. § 1401(9)(d).

108. Under IDEA, every student receiving special education services must be given an annual IEP. 20 U.S.C. §§ 1401(14), 1412(a)(4), 1414(a), and 1414(d).

109. The IEP must set forth all special education and related services the school district will provide the student as well as educational goals for the student. 34 C.F.R. § 300.320(a)(4).

110. J.C. is a child with a disability within the meaning of IDEA who is entitled to special education and related services.

111. Defendant refused to comply with the IEP developed by J.C.'s IEP Team by failing to provide nursing services on the bus to and at the therapeutic day school selected in J.C.'s IEP.

112. Nursing services are necessary for J.C. to attend school. Without nursing services, J.C. cannot attend class.

113. Defendant's willful failure to comply with J.C.'s IEP resulted in J.C. being deprived of FAPE.

114. Defendants refused to comply with the IEP deliberately, without reason, in bad faith and with gross misjudgment.

115. Defendant willfully, intentionally, and with deliberate indifference refuse to implement the nursing services set forth in J.C.'s IEP.

116. Defendant acted with at least deliberate indifference to the certainty that a violation of J.C. and Kadi Channell's federally protected rights would result.

117. J.C. is entitled to remain in his "then current educational placement" while working out his dispute with Defendant under the IDEA's "stay put" provision. 20 U.S.C. § 1415(j).

118. Defendant has announced its intention to violate J.C.'s right to "stay put," by indicating that they were referring him to a different school.

119. Defendant's acts and omissions constitute a violation of J.C. and Kadi Channell's rights under the IDEA. Defendant's conduct constitutes an ongoing and continuous violation of the ADA, and unless restrained and enjoined from doing so, Defendants will continue to violate the ADA. Defendants' acts and omissions, unless enjoined, will continue to inflict irreparable injuries for which Plaintiffs have no adequate remedy at law.

## **RELIEF SOUGHT**

WHEREFORE, Plaintiffs pray that this Court:

A. Declare that CPS has discriminated against J.C. and Kadi Channell by failing to provide nursing services for J.C. under the terms of his IEP and at the therapeutic day school selected in his IEP.

B. Declare that CPS has discriminated against J.C. and Kadi Channell by failing to administer its nursing services in a manner that provides nursing services for J.C. under the terms of his IEP and at the therapeutic day school selected in his IEP.

C. Declare that CPS has discriminated against J.C. and Kadi Channell by failing to modify its system for administering nursing services so that J.C. could

receive nursing services required by his IEP and at the therapeutic day school at which CPS enrolled J.C. in compliance with his IEP.

      D.      Enter a preliminary and permanent injunction against the Defendant ordering it to modify its administrative system for providing nursing services so that J.C. can receive those services as required by his IEP at Acacia Academy.

      E.      Order the District to pay for compensatory services for J.C.'s missed days of instruction.

      F.      Award Plaintiffs monetary damages in compensation for J.C.'s lost schooling.

      G.      Award Plaintiffs reasonable costs and attorneys' fees.

      H.      Grant such other relief as this Court deems just and proper.

DEMAND FOR A JURY TRIAL

Plaintiffs demand a jury trial on all issues properly triable by a jury.

Dated: September 10, 2021

                        Respectfully Submitted,

                        __/s/ Charles R. Petrof_____
                        Charles R. Petrof,
                        Senior Attorney at Access Living

Charles R. Petrof
**Access Living of Metropolitan Chicago**
115 W. Chicago Ave.
Chicago, Illinois 60654

Phone:   (312) 640-2124
Fax:       (312) 640-2139
TTY:      (312) 640-2169
E-mail: cpetrof@accessliving.org

Jacqueline Ross
*Civitas* ChildLaw Clinic
Loyola University Chicago School of Law
25 E. Pearson St., 11th Floor
Chicago, Illinois 60611
Phone: (847)542-9838
E-mail: jross10@luc.edu