IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KADI CHANNELL, Individually and as Parent and Next Friend of J.C., a minor, | ) ) ) |
| Plaintiff, | ) Case No. 21-cv-4812 ) ) Judge Robert M. Dow, Jr. |
| v. | ) ) |
| CHICAGO BOARD OF EDUCATION a/k/a Chicago Public Schools, | ) ) ) |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kadi Channell filed a complaint [1] in federal court alleging that Defendant Chicago Board of Education ("CPS") violated her rights individually and as parent and next friend of minor, J.C., under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, among other federal laws. Now before the Court is Plaintiff's motion [8] for a temporary restraining order and preliminary injunction. For the reasons discussed below, the Court denies Plaintiff's motion for a temporary restraining order and preliminary injunction [8]. In addition, the Court takes CPS's motion to dismiss [16] under advisement and directs the parties to submit a joint status report no later than November 10, 2021, indicating whether they wish to brief the motion to dismiss at this time or hold in abeyance pending further discussions on a potential resolution of the overarching issues in this litigation. If they wish to brief the motion, the parties should include in their joint status report a proposed briefing schedule.

**I.  Background**

  **A.  Factual Background**

Plaintiff's child, J.C., is a student of CPS who receives an Individualized Education Plan ("IEP") in connection with his significant physical and learning disabilities. [1 (Compl.) ¶¶ 23–

30.] Relevant here, J.C. suffers from seizures and a reading disability, oppositional defiant disorder, and adjustment disorder with depression. [*Id.* ¶¶ 24–25, 28, 34–37.] Certain of Plaintiff's seizures require rectal administration of medication. [*Id.* ¶ 29.] While J.C. was in eighth grade, attending a CPS-authorized charter school, his IEP was revised to provide that a nurse would administer that medication and accompany J.C. throughout the school day and on the bus. [*Id.* ¶¶ 29–30.]

Central to this motion, Plaintiff's IEP was revised in December 2020 to change his placement to a therapeutic day school, in hopes of addressing J.C.'s performance and specific learning needs. Prior to December 2020, Plaintiff attended CPS-authorized charter schools. [1 (Compl.) ¶¶ 30, 32.] During the December meetings, however, the attendees identified Plaintiff's need for a multisensory learning program and revised his IEP, which, as finalized "directed his placement at a therapeutic day school that offered a phonics-focused literacy program." [*Id.* ¶ 37; 8-1 (Channell Aff.) ¶ 26; 8-4 (Dec. 2020 IEP); 8-9 (Channell Mediation Request) at 2.]

Following finalization of the December 2020 IEP, disagreement arose regarding the specific school J.C. would attend. During the IEP meeting, Plaintiff had proposed Acacia Academy, a private school located in LaGrange, Illinois. [8-1 (Channell Aff.) ¶¶ 21–22.] Although CPS demonstrated interest in the school and contacted Acacia about the possibility, their exchanges exposed challenges with J.C.'s placement at Acacia. [*Id.* ¶ 28.] Acacia informed CPS that it did not have a nurse on staff, and that no staff was willing to perform that function as a trained aide who could accompany J.C. on the bus because it would involve a lengthy commute. [8-14 (Fouks Aff.) ¶ 9.] CPS then notified Plaintiff that J.C. would attend Menta Academy, in Oak Park, Illinois. [8-1 ¶ 30.] Following an unsuccessful mediation between Plaintiff and CPS, Acacia and CPS reached an agreement to place J.C. at Acacia remotely. [1 (Compl.) ¶ 52; 8-1

¶¶ 31–32.] Plaintiff attended Acacia remotely from March 2021 through the end of the 2020-21 school year. [8-1 ¶ 33.]

During that same period—the December 2020 IEP meeting and period following—the parties also disagreed over and made changes to the services provided for Plaintiff's seizures. For several years, with the exception of remote learning periods, CPS provided nursing services to J.C. during the school day and while he traveled on the bus to CPS charter schools. [1 (Compl.) ¶¶ 29–52.] However, over Plaintiff's objections, the IEP finalized in December 2020 provided that a seizure aide, not a certified nurse, would accompany Plaintiff to a therapeutic day school. [8-1 (Channell Aff.) ¶¶ 25–26.] At that juncture, schools were operating remotely, and therefore CPS did not provide a nurse or other aide to J.C. while he attended Acacia remotely. [8 (Pl.'s Mot. in support of Temporary Restraining Order and Preliminary Injunction ("Pl.'s TRO Mot.") at 2.]

In June 2021, a new IEP was adopted ("the June 2021 IEP"), which includes several other provisions at the heart of this motion. The June 2021 IEP provided, again, for a nurse rather than an aide. [8-1 (Channell Aff.) ¶ 34; 8-10 (June 2021 IEP) at 6.] Specifically, Plaintiff's June 2021 IEP states that Plaintiff was entitled to a nurse to accompany him at Acacia and on the bus. The IEP does not specify which entity would hire the nurse. [Id. at 6, 31.] The IEP also provides that "[i]f the nurse para is not able to attend school for a day and no substitute is available, [J.C.] will participate in remote learning for that day." [Id. at 6.] Nevertheless, the record indicates that J.C. has neither attended Acacia in person, nor has J.C. ever been accompanied by a nurse while attending a private school. [8-14 (Fouks Aff.) ¶ 25; 8-1 ¶ 45.]

In the months following, CPS informed Acacia that Acacia must hire a nurse and that CPS would reimburse Acacia after-the-fact. [1 (Compl.) ¶ 57; 8-14 (Fouks Aff.) ¶ 17; 18 (Pl.'s Reply in support of Pl.'s TRO Mot. ("Pl.'s TRO Reply")) at 2.] As of the date of this order, and as a

result of a combination of administrative obstacles, the dearth of available nurses and the high cost hiring them, and concerns about the delay between payment and reimbursement from CPS, Acacia has been unable to hire a nurse. Without a nurse to accompany J.C. on the bus or during school, at the start of the school year, J.C. was unable to attend Acacia in person. [1 ¶¶ 68–69; 8-14 ¶ 24.] J.C. has been unable to attend school since that time because remote instruction at Acacia has been discontinued. [8-14 ¶ 25; 8-1 (Channell Aff.) ¶ 45.]

### B. Procedural Background

In September 2020, Plaintiff filed this lawsuit [1]. Individually and as parent and next friend of J.C., Plaintiff alleges that CPS has violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794, and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* Plaintiff then moved this Court for a temporary restraining order and preliminary injunction under Federal Rule of Civil Procedure 65 [8.] CPS opposed that motion and moved for dismissal of the complaint in its entirety [16.] Briefing was held in abeyance as the parties endeavored to work out an arrangement acceptable to both sides. Their negotiations centered on recruiting a nurse to accompany J.C. to Acacia, among other alternatives. [23 (Joint Status Report ("Joint Status")) at 3.]

The parties' reports and briefing, however, revealed obstacles to placing J.C. at Acacia. On the one hand, securing J.C.'s attendance at Acacia is a tall order. First, Acacia does not have a nurse on staff, [8-1 (Channell Aff.) ¶ 24], and thus a long-term solution for J.C.'s attendance at Acacia involves hiring someone to work the full school day and the bus ride to and from school. Second, J.C. lives in Chicago, but Acacia is located in LaGrange, Illinois. The commute from Chicago to LaGrange and back, together with the full school day, necessarily means the position entails a long shift, to say nothing of the nurse's own commute to and from J.C.'s home. [23 (Joint

Status) at 2; 16-5 (Green-Shelton Aff.) ¶ 9; 8-14 (Fouks Aff.) ¶ 9] (discussing challenge the commute time posed to recruiting candidates, nurses and aides alike).

Furthermore, while filling the position likely would present challenges during normal times, CPS reports, and Plaintiff's own efforts confirm, that these times are anything but normal in regard to the market for nursing services. Because of a national and local nursing shortage, CPS and Acacia have encountered difficulties recruiting, affording, and administering a nurse for Acacia. According to CPS, the shortage has made it difficult to fill J.C.'s and multiple other CPS students' nursing needs. [16-5 (Green-Shelton Aff.) ¶¶ 7, 12.] CPS also reports an inability to recruit a nurse to fill the position from its own agencies and vendors. [23 (Joint Status) at 2.] Although CPS's Director of School Nursing for Chicago Public Schools has contacted those agencies, nurses either have not shown interest in the position, or have declined after learning the details of the position. [16-5 ¶¶ 9–10.] Compounding those obstacles, the shortage has also increased the competition for hiring nurses, with employers willing to pay higher salaries and offer incentives to recruit candidates. [*Id.* ¶ 7]; [8-14 (Fouks Aff.) ¶ 18] (private vendors indicated weekly cost for nurse would range from $2,200-$2,600 per week); [20 (Def.'s Suppl. Facts) Exs. 1–2] ("highlight[ing] both CPS and Acacia's unsuccessful efforts to secure a nurse in light of the ongoing pandemic and nursing shortage.")

The parties have thus also discussed using a private vendor to fill the position, [8-14 (Fouks Aff.) ¶ 18; 23 (Joint Status) at 2], but because of the demands of the position and hourly salary in the current market, using an outsider vendor triggered administrative problems for both CPS and Acacia. CPS reports that its collective bargaining agreement with its nursing union limits its ability to unilaterally pay a higher rate for the position. [27 (Def.'s Sur Reply) at 4.] Acacia reports administrative problems with the upfront expenses involved in that process: the lag between

payment and CPS reimbursement, particularly given the going rates for nurses, is a large burden for a small school. [8-14 ¶ 19.] Although the parties have discussed accommodations to ensure timely payment and reimbursement and Acacia has tried to secure a nurse [23 at 3], it, too, has encountered problems filling the slot. For example, eligible candidates have not yet selected the position, and others do not meet certain legal criteria [20 (Def.'s Suppl. Facts) Exs. 1–2; 27-1 (Bijou Aff.) ¶ 8] (discussing lack of verification by IRS of agency identified by Acacia).

The parties' negotiations reached an impasse. Briefing on Plaintiff's motion for a temporary restraining order and preliminary injunction [8] is now complete, and that motion is now before this Court.

**II.     Legal Standard**

In *Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020), the Seventh Circuit recited the standard for preliminary relief in this Circuit:

> To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). If a plaintiff makes such a showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it. *Courthouse News Serv.*, 908 F.3d at 1068. This balancing process involves a "sliding scale" approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Mandatory preliminary injunctions—those "requiring an affirmative act by the defendant"—are "ordinarily cautiously viewed and sparingly issued." *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997); see also *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (review of a preliminary injunction is "even more searching" when the injunction is "mandatory rather than prohibitory in nature.")

*Id.* at 818; see also *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). With specific regard to the strength of the moving party's case on the merits, the Seventh Circuit

explained in *Mays v. Dart*, 974 F.3d 810, 821-22 (7th Cir. 2020), that the "better than negligible" standard often employed in cases prior to *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008), was "retired" in that case and replaced with a "higher standard," pursuant to which "[a] plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on the merits." *Mays*, 974 F.3d at 822 (emphasis in original) (quoting *Winter*, 555 U.S. at 20). Elaborating, the court of appeals stated that "a plaintiff must demonstrate that "its claim has some likelihood of success on the merits, * * * not merely a 'better than negligible chance'" and that "[w]hat amounts to 'some' depends on the facts of the case at hand because of our sliding scale approach." *Id*. (citations omitted).

**III.     Analysis**

Plaintiff filed the instant motion, requesting "relief to enjoin CPS from changing the manner of administering nursing services, which were previously hired by CPS." [8 (Pls.'s TRO Mot.) at 1.] As a practical matter, however, Plaintiff wants J.C. to attend Acacia, accompanied by a nurse. As the Court sees it, Plaintiff had three main options to try accomplishing that end: (1) use the administrative process to appeal CPS's decision, (2) convene an IEP meeting to modify Plaintiff's IEP, for example, to select a different school or to require that CPS hire a nurse for Acacia, or (3) file suit in federal court to seek an injunction. Plaintiff selected option three. As explained below, that option cannot yield any helpful relief for Plaintiff. To begin, as Plaintiff appears to recognize, many of the potential solutions to this challenging problem are only available to her through the administrative process, not a federal court. Moreover, even the limited relief Plaintiff now seeks in court cannot be awarded because Plaintiff has not met her threshold burden of showing that she is likely to succeed on the merits, which is a prerequisite to granting the mandatory preliminary injunction she requests. Perhaps discovery would reveal facts that would

7

improve Plaintiff's chances of getting even the limited relief she can seek in court prior to exhausting her administrative remedies. But, as suggested below, options one and two may be more viable avenues for more meaningful relief to the current, unfortunate logjam over J.C.'s school placement.

### A. Plaintiff's Failure to Exhaust

The Court begins by highlighting a tension in the instant motion. As a practical matter, Plaintiff wants to place J.C. at Acacia, in-person. However, direct relief on that placement is not available to her through the Court, but rather must be obtained, if at all, through the administrative process. The Supreme Court teaches that unless and until a Plaintiff has fulfilled the IDEA's mandates, this Court cannot review a federal lawsuit for which the "gravamen" of her complaint is a denial of her right to a Free and Appropriate Public Education (FAPE). See *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017).

In this case, as she concedes [18 (Pl.'s TRO Reply)], Plaintiff has not availed herself of the administrative remedies and therefore has not exhausted the administrative process required by the IDEA. Accordingly, both parties appear to recognize that, under *Fry*, Plaintiff cannot seek relief (whether under the IDEA, ADA, or any other federal law) for a deprivation of any substantive right J.C. may have to attend Acacia or of any right to be accompanied by a nurse at Acacia. The Court agrees with that analysis, as the "gravamen" of a complaint directly seeking that relief would be that CPS has denied J.C. a FAPE. See *id.*; see also *N.S. v. Bd.of Educ. of Chi.*, 2019 U.S. Dist. LEXIS 149296 *N.D]. Ill. Sept. 3, 2019) (failure to exhaust administrative remedies under IDEA warranted denial of temporary injunctive relief and termination of plaintiff's case). For practical purposes, that means that the Court cannot furnish the real relief that Plaintiff wants—namely, (1)

ordering J.C.'s placement at Acacia, in person; and (2) ordering the provision of a nurse to accompany J.C. on the bus to Acacia.

In apparent recognition that these exhaustion principles constrain the Court's authority to provide solutions, Plaintiff has resorted to asking this Court for a much more limited form of relief. Plaintiff asks the Court to restore a "process."[1] Specifically, she asks this Court to order *CPS* to hire and pay the nurse in lieu of the current state of affairs, in which CPS has asked *Acacia* to hire and pay the nurse, then seek reimbursement on the back end. See [8 (Pl.'s TRO Mot.) at 1; 18 (Pl.'s TRO Reply) at 2.] In short, Plaintiff clarifies that she has intentionally framed her complaint to raise an *administrative* issue, "completely outside the IEP process," and thus not subject to exhaustion. [*Id.* at 3.]

For present purposes, the Court assumes (without actually deciding) that the "gravamen" of Plaintiff's complaint is an administrative issue not subject to *Fry*'s exhaustion requirement. Even so, as explained in further detail below, Plaintiff is not entitled to relief because she has not shown a likelihood of success on the merits to warrant preliminary injunctive relief.

**B. Merits**

In her opening brief, Plaintiff asks the Court's order "to restore the status quo in which CPS hired a nurse to provide the nursing service specified in J.C.'s IEP." [8 (Pl.'s TRO Mot.) at 4.] Plaintiff thus seeks a process that would functionally require CPS, not Acacia, to take responsibility for hiring a nurse. However, Plaintiff has not shown a likelihood of prevailing on the merits because the record does not establish that any "process" by which *CPS* was obligated

---

[1] In her opening brief, Plaintiff requested "relief to enjoin CPS from changing the manner of administering nursing services, which were previously hired by CPS." (In a reply brief, Plaintiff drills down further to take issue with "the manner in which Defendant changed its administration of its nursing services—unilaterally terminating its practice of hiring a nurse to assist J.C. and demanding instead that the therapeutic day school J.C. attends hire its own nurse and seek reimbursement of those costs from Defendant.")

to hire and pay a nurse to accompany J.C. to *Acacia* ever existed.[2] And if no such process existed, there is no basis on which the Court can order it to be "restore[d]."

### 1. Likelihood of Success on the Merits

The Court cannot order CPS to hire a nurse to accompany J.C. to Acacia because Plaintiff has not pointed to any evidence in the record that this specific process ever existed. As CPS points out in its sur-reply [27], CPS has not agreed to nor enacted a policy to hire a nurse to accompany J.C. to *this, specific, private* school. CPS's contracts contemplate that *private schools* such as Acacia will assume responsibilities "related to [a student's] IEP," as does the state administrative code. The Illinois Administrative Code requires private facilities to implement the IEP, which includes "related services." 23 Ill. Admin. Code § 401.140. Therefore, there is a clear gap between CPS's status quo policy and Plaintiff's request.

Nor do any facts in the record contravene CPS's position. The record reveals that CPS has hired a nurse to accompany J.C. to attend *CPS-charter schools*. [1 (Compl.) ¶¶29–32; 8-1 (Channell Aff.) ¶¶ 10–14.] Then, in December 2020, CPS entered an IEP with two provisions relevant here. The first provision was that Plaintiff was entitled to attend *a therapeutic day school*, not any specific school (*e.g.*, Acacia). See [1 ¶ 37; 8-4 (Dec. 2020 IEP); 8-1 ¶ 26] ("[T]he IEP team finalized J.C.'s IEP which directed his placement at a therapeutic day school that offered a phonics-focused literacy program"). The second provision was that Plaintiff was entitled to *an aide* to accompany J.C. [8-1 ¶ 26] ("[T]he IEP team finalized J.C.'s IEP * * * providing the services of a seizure delegated care aide instead of a nurse."). Plaintiff's June 2021 IEP states that Plaintiff was entitled to a *nurse* to accompany him at Acacia and on the bus. [8-10 (June 2021 IEP)

---

[2] The Court also notes that to some extent, Plaintiff has obtained the functional equivalent of the relief she requests in that all parties, CPS included, have invested considerable effort into recruiting a nurse to accompany J.C. to attend Acacia. Those efforts have not (yet) succeeded, but CPS has voluntarily engaged in the process of looking for a nurse.

10

at 6, 31.] However, that IEP does not specify which entity would hire the nurse. [*Id.* at 6, 31] ("Transportation services will be provided by CPS."). The June 2021 IEP also provides that Plaintiff would attend school remotely if no nurse is available. [*Id.* at 6.] As CPS points out, the record indicates that J.C. has not attended Acacia in person, much less with a nurse. See [16 (Def.'s Reply to Pl.'s TRO Mot.) at 19.]

In sum, there are three key differences between Plaintiff's request—for CPS to hire a nurse to accompany J.C. to Acacia—and the status quo. Put another way, Plaintiff has not identified any obligation on the part of CPS to honor Plaintiff's request, either by law or agreement. The first difference is that CPS never agreed to *hire a nurse to accompany J.C. to a private school*. The second difference is that CPS never did so in practice either—CPS has *only hired nurses to accompany J.C. to CPS-authorized charter schools*. The third difference is that CPS did not agree specifically that *CPS* would hire (rather than reimburse) a nurse for Acacia. Plaintiff therefore effectively invites the Court to issue a mandatory injunction—requiring *CPS* to alter *its* status quo. The Court declines that invitation. See *Illusions Too Reality, LLC v. City of Harvey*, 2003 WL 260335, at *4 (N.D. Ill. Feb. 4, 2003) ("A temporary restraining order is an emergency remedy issued to maintain *the status quo*" (emphasis added)).

None of Plaintiff's arguments to the contrary alter this analysis. To be sure, CPS engaged "in conversation with Acacia about the possibility of placing J.C. there." [8-1 (Channell Aff.) ¶ 28.] CPS ultimately agreed to place J.C. at Acacia, but that agreement was reached while Acacia was operating *remotely*. [*Id.* ¶¶ 32–33.] Acacia entered an IEP in June 2021 that Plaintiff was entitled to a nurse, but which provided that "if the nurse para is not able to attend school for a day and no substitute is available, [J.C.] will participate in remote learning for that day." See [8-10

(June 2021 IEP) at 6.] These facts fall short of showing that CPS ever agreed to hire a nurse to send to Acacia, rather than to reimburse Acacia for hiring its own nurse.

Nor is it an answer to say that CPS agreed to hire a nurse for Acacia by collaborating with Plaintiff over the past two months in an effort to find a nurse. The Court appreciates that over the past two months, all parties, including CPS, have invested significant effort attempting to solve a real problem. The parties did so at Plaintiff's request and with the Court's encouragement in the interest of avoiding litigation—which would have yielded only a partial answer even if Plaintiff were entitled to the full measure of admittedly limited relief she has requested. The Court will not treat CPS's affirmative efforts during the course of litigation as an agreement to hire a nurse or as creating a new status quo for these purposes.

To the extent that Plaintiff argues that federal law (the ADA, IDEA, or otherwise) preempts the state administrative scheme or collective bargaining agreement, the argument fares no better for two reasons. First, Plaintiff has not availed herself of the administrative process. As the Court explained in Part III.A., the gravamen of Plaintiff's claim is that J.C. is entitled to reasonable accommodations (a nurse, a placement at Acacia) and that because those accommodations are not in place, CPS is violating J.C.'s right to a FAPE. Second, any argument that CPS is denying its ultimate obligation to provide a FAPE to J.C. is unavailing. CPS does not contest that J.C. is entitled to a FAPE, but simply views J.C.'s right to a FAPE as a macro-level obligation that is honored by carrying out the terms of an IEP. The Court agrees: a FAPE is a general right, and Plaintiff is asking for something more specific—a right to attend Acacia, accompanied by a nurse hired by CPS. Everyone appears to agree that J.C. has a right to a FAPE, and (as noted below), CPS acknowledges its obligation to return to the table for additional meetings on a revised IEP if the current one is not working, as that is part and parcel of its duty to provide J.C. a FAPE. Plaintiff

has not identified the source of any such right to the specific, limited relief she requests, and thus no basis for the Court to issue an injunction compelling CPS to honor that right at this time.

In sum, Plaintiff has not proven that CPS *did* engage in a change of policy because the Court does not find the current evidence in the record shows that CPS obliged itself (either by contract, state, or federal law) to hire a nurse to accompany J.C. to Acacia. This is not to say that Plaintiff could not, with more discovery, develop a record to show that CPS did in fact agree to hire a nurse upfront to send on the bus to Acacia or that the Defendants have violated any other federal law. But it seems unlikely that the parties would not already be aware of such documentary or testimonial support for the proposition, if it existed. Certainly at this juncture, Plaintiff has not made a showing that the "process" Plaintiff requests ever existed, and therefore she has not carried her burden to show "[s]he is *likely* to succeed on the merits." *Mays*, 974 F.3d at 822 (quoting *Winter*, 555 U.S. at 20) (emphasis in original).

### 2. Other Factors

As noted above, to obtain a preliminary injunction, "a plaintiff must show that: (1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Illinois Republican Party*, 973 F.3d at 763 (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). The Court has concluded that Plaintiff's request for an injunction fails the third prong cited above. Nevertheless, in the interest of completeness, the Court will briefly address the balancing analysis that it would have been required to undertake had Plaintiff made the requisite threshold showing. See *Courthouse News Serv.*, 908 F.3d at 1068.

There is no question that Plaintiff has suffered harm. During the course of this litigation, J.C. has spent more than two months without in person education and (it appears from the record) without remote learning, either. The Court recognizes that in the absence of injunctive relief or a negotiated resolution, J.C. will remain unable to attend Acacia in person, and there is no question that the loss of instruction time is harmful to J.C. and frustrating for Plaintiff. That said, the other side of the scale in regard to the balance of harms is not empty, and thus the low likelihood of success on the merits of the claim advanced by Plaintiff is sufficient to tip the scale against the award of injunctive relief under the Seventh Circuit's "sliding scale" approach. See *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (explaining that the balancing process involves a "sliding scale" approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa).

CPS has submitted factual support for the propositions that it faces a local nursing shortage, that other CPS students also need access to nursing services, and that any order from this Court requiring CPS to hire a nurse for Plaintiff to attend Acacia may deny other CPS students access to a nurse.[3] This is one reason why decisions regarding which school and which accommodations are most appropriate for students with IEPs generally are made in the first instance by expert hearing officers, not generalist federal judges. At present, it appears that there are more students who need certain nursing services than there are available nurses in the CPS school system. Judges can only decide individual cases or controversies before them; they cannot take a systemic approach to parceling out limited resources to where they are needed most. To be sure, J.C.

---

[3] Furthermore, CPS suggests that a mandatory order from this Court might also bring about other harms to CPS. As one example, the record suggests that in the current nursing market, CPS might be unable to hire a nurse at the rate agreed to in its collective bargaining agreement. It follows that *if* CPS had to pay a nurse a higher rate in order to comply with a court order requiring CPS to fill the position, CPS runs the risk of violating its obligation not to unilaterally change the terms and conditions of employment. See, *e.g.*, [27-3 (CPS Collective Bargaining Agreement), arts. 1-1.1, 1.2, 50.]

presents a compelling case for substantial accommodations, and it is tragic that he has been out of school for two months. But there is no evidence to suggest that CPS, Acacia, and every other school that J.C. has attended are not aware of and acutely sensitive to J.C.'s needs, and thus no reason for concluding that the administrative process would not treat J.C. fairly, alongside every other student in need of services.

It also is worth noting that in denying Plaintiff a temporary and preliminary injunction to require CPS to hire a nurse to accompany J.C. to attend Acacia, the Court does not disagree with Plaintiff's view that CPS is ultimately responsible for ensuring that CPS honors J.C.'s right to a FAPE. CPS is not disputing that, either. In fact, to its credit, CPS has become increasingly involved in trying to find a solution to a complex problem—exacerbated by the pandemic—despite its contention (and the Court's agreement) that it is not legally obligated to hire a nurse to accompany J.C. to Acacia as part of its ultimate obligation to ensure a FAPE. Indeed, all parties to this litigation and their partners like Acacia have commendably made considerable efforts to locate a nurse willing to implement the current IFP. As noted above, all that the plan requires—travel from the nurse's home to J.C.'s home in Chicago, further travel to a school in the suburbs, a full school day, and then the reverse commute back to J.C.'s home and then to the nurse's own home—appears to be a hefty request. The inability to find a nurse despite this concerted effort leaves the Court to wonder whether the most plausible path forward is neither an injunction nor invoking the administrative process, but rather a meeting to revisit the IEP and consider whether Plaintiff can find an alternative placement school for which a nurse will be available. By doing so, the parties might be able to move on to something that would allow the district to uphold its ultimate obligation and J.C. to resume in-person education.

## IV. Conclusion

Accordingly, for the reasons discussed above, Plaintiff's motion for a temporary restraining order and preliminary injunction [8] is denied. CPS's motion to dismiss [16] is taken under advisement. The parties are directed to submit a joint status report no later than November 10, 2021, indicating whether they wish to brief the motion to dismiss at this time or hold in abeyance pending further discussions on a potential resolution of the overarching issues in this litigation. If they wish to brief the motion, the parties should include in their joint status report a proposed briefing schedule.

Dated: November 3, 2021

_____
Robert M. Dow, Jr.
United States District Judge